## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **3:18CR81 (SRU)** |
| **v.** | **:** | |
| | **:** | **MARCH 31, 2020** |
| **JONATHAN BRITO** | **:** | |

### EMERGENCY MOTION FOR COMPASSIONATE RELEASE

JONATHAN BRITO, through undersigned counsel, respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release.  The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Mr. Brito's health.  The virus thrives in densely packed populations, and the MDC is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Mr. Brito.  Mr. Brito currently suffers from diabetes, severe asthma and his requests for medical assistance have gone ignored, and these make him especially vulnerable to the deadly risks of COVID-19.  Allowing Mr. Brito to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus, especially given the fact that he is serving a six month sentence that commenced on November 5, 2019 and is scheduled to be released on May 3, 2020.

Attached for the Court's consideration in connection with this motion is an expert affidavit that generally addresses the increased public health risks from keeping at-risk inmates incarcerated during the pandemic, *see* Affidavit of Dr. Brie Williams, attached as Exhibit A, and an expert affidavit that specifically address conditions at the MDC, *see* Affidavit of Dr. Jonathan Giftos, attached as Exhibit B.

### I. Procedural History.

Mr. Brito was sentenced by this Court to six months of imprisonment.  He self-surrendered on November 3, 2019.  His six month max date will bring him to May 3, 2020.  As he is required to serve the first six months of supervised release on home confinement, it would be requested that the remainder of his sentence be converted to home confinement as well.[1]

### II. Client's Current Conditions of Confinement and Health Conditions.

Mr. Brito is particularly vulnerable to COVID-19 because he is already quite ill with diabetes, asthma and the fact that he is still recovering from being shot last year.  Furthermore, his incarceration at Brooklyn MDC make things even worse.  As of 8:00am on March 31, 2020, the new strain of coronavirus which causes COVID-19 has infected over 781,830

---

[1] Undersigned counsel was actually notified via email from Amanda David, Assistant Federal Defender in the Federal Defender's Office of the Eastern District of New York (Amanda_David@fd.org) with the following email (in pertinent part): "I am reaching out because MDC has provided the Federal Defenders with a partial list of inmates they consider to be vulnerable/high risk during the COVID-19 pandemic. Your client Jonathan Brito's name is on the list, potentially because of his age and maybe because of other health factors. That is all the information that we have about him. I see from the docket that he is currently serving a 6-month sentence and self-surrendered a few months ago…"

2

people, leading to more than over 37,500 deaths worldwide.[2]  On March 11, 2020, the

World Health Organization officially classified COVID-19 as a pandemic.[3]  On March 13,

2020, the President of the United States declared a national state of emergency in

response to the disease's spread.[4]  Previously, Governor Cuomo declared a State of

Emergency,[5] and Mayor de Blasio declared a State of Emergency in New York City.[6]  As

of March 30, 2020 @ 4:30pm, there are 66,497 positive cases in New York State,[7] and

38,087 positive cases in New York City.[8]  Those include positive cases at Rikers Island,

the Nassau County jail, and now the MDC.[9] COVID-19 has also reached the Connecticut

Department of Corrections, as recent news reports indicate.[10]

       The CDC issued guidance that individuals at higher risk of suffering

---

[2] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 31, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

[3] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.

[4] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, President Donald J. Trump (March 13, 2020), *at* https://bit.ly/33waihz.

[5] *At Novel Coronavirus Briefing, Governmor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (March 11, 2020) *at* https://on.ny.gov/2TKzIoz.

[6] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, New York Times (March 12, 2020).

[7] *Novel Coronavirus (COVID-19),* New York State Department of Health (March 25, 2020) *at* https://on.ny.gov/2vfFQvy (updating regularly).

[8] *Coronavirus*, New York City Health (March 25, 2020) *at* https://on.nyc.gov/39ME7wU (updating regularly).

[9] *Rikers Island Inmate Has Contracted Coronavirus: Officials*, N.Y. Daily News (March 18, 2020), *at* https://bit.ly/2Qt7aOf; *Coronavirus Update: Long Island Inmate Put in Isolation After Testing Positive for COVID-19*, WABC-TV (March 16, 2020), *at* https://abc7ny.com/6019279/.; *Trump Weighs Release of Some Federal Prisoners After Inmate Tests Positive for Coronavirus*, USA Today (March 22, 2020), *at* https://bit.ly/2wFJrDZ.

[10]     https://www.fox61.com/article/news/local/department-of-corrections-employee-tests-positive-for-covid-19/520-8e52dada-9272-4c16-9310-6b2ad48e6f4f.   Viewed on March 26, 2020 at 2:15 pm.

complications from COVID-19 take immediate preventative actions, including avoiding crowded areas, staying home as much as possible, practicing social distancing, frequently washing hands, and avoiding contact with common surfaces.[11]  These steps are necessary to prevent infection.  But they are essentially impossible to implement in pretrial detention facilities, such as the MDC.[12]

Inmates cycle in and out of MDC from all over New York City, New York State, the country, and even the world.  The people who work in the facilities leave and return daily, without screening.  Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers and Bureau of Prison facilities.[13]  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[14]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and

---

[11] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.

[12] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[13] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[14] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

prisons dealt with high numbers of cases.[15]  With the recent identification of infected inmates in nearby jails, it is only a matter of time before the disease spreads among the local detainee population, including in the MDC.  Precisely because of this high risk of contagion in detention facilities, Brooklyn District Attorney Eric Gonzalez and various public health experts have asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[16]  On March 18, 2020, Mayor DeBlasio announced his intent for all local jails to release its high-risk pretrial detainees.[17]

Given the pandemic and the overall state of emergency in New York City, MDC-Brooklyn is unable to protect the health and safety of defendants in its custody, especially against a contagious disease such as COVID-19.  The MDC is a massive pretrial detention facility, housing approximately 1,700 people.  Correctional officers from New York and surrounding states arrive to the facility each day.  The majority detained are housed in small two-man cells (originally designed for one inmate to inhabit) with a shared toilet and sink, and eat meals and have recreation in groups of 70 or more.  Other units are open dormitories that house 70 or more inmates without the ability to separate.  The undersigned does not know which area of the prison

---

[15] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (March 7, 2020) *at* https://bit.ly/2TNcNZY.

[16] Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (March 12, 2020), *at* https://theappeal.org/sentenced-to-covid-19/.

[17] *NYC To Begin Releasing Inmates Amid Coronavirus Outbreak*, N.Y. Post (March 18, 2020), *at* https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/.

Betancourt is being held in, though the difference does not matter.  For a man with his health history and complications, *any area* of the jail is unsafe.

The MDC's medical care has repeatedly failed to adequately address even routine medical conditions.[18]  In times of crisis, the medical care has halted entirely. For an entire week in January and February 2019, during the sub-zero temperatures of the "Polar Vortex," MDC Brooklyn went without power and heat, and inmates were locked down for days at a time and denied hot food or additional blankets and warm clothing.[19]  Inmates with serious pre-existing physical and mental illnesses received no care.[20]  Even the most basic efforts, such as moving inmates requiring sleep apnea machines to breathe to the available floors with electricity, were not taken.[21]  The "very cruel conditions" during the 2019 blackout have prompted multiple judges to grant downward variances to those defendants who suffered them. Tr. of Sent. Hr'g. at 12, *United States v. Acosta De La Rosa*, 18-CR-667 (PKC) (E.D.N.Y. Jun. 4, 2019) (ECF No. 16); *see, e.g.*, *United States v. Douglas*, 18-CR-554 (PKC) (E.D.N.Y. 2019); *United States v. Lewis*, 18-CR-565 (ENV) (E.D.N.Y. 2019); *United States v. Williams*, 19-CR-5 (KAM)

---

[18] *E.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016*, *at* https://bit.ly/39JRhdW.

[19] *See* Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and "Frantic,"* N.Y. Times (Feb. 1, 2019), *at* https://nyti.ms/2sXCIQg; Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[20] Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[21] *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, Office of the Inspector General, U.S. Department of Justice at 29 (September 2019) *at* https://oig.justice.gov/reports/2019/e1904.pdf.

(E.D.N.Y. 2019); *United States v. Ozols*, No. 16-CR-692 (JMF) (S.D.N.Y. Feb. 12, 2019) (ECF No. 31).

By reason and belief since the undersigned spoke with attorneys in the greater New York area, the MDC has not met even the most basic recommendations of the CDC for preventing the spread of the coronavirus. Though the undersigned cannot independently verify these facts, based on court filings in similar cases and after speaking with attorneys who are familiary with the daily conditions at the MDC, the jail has no screening mechanism in place for staff, other than self-reporting, and it had no such screening for visitors prior to the suspension of legal and social visitation on March 13, 2020.  The staff is not wearing face masks or gloves.  Hand sanitizer is not available to the inmates.  Plans exist to provide bar soap to inmates, but as of now, not every inmate has access to soap.  Only those inmates who have money for commissary will be able to purchase additional soap beyond what the MDC has supplied.  It has no medical ward or facility in place to house infected inmates.  The MDC's only stated plan, should an inmate become symptomatic for COVID-19, is to confine that inmate to the Special Housing Unit ("SHU"), where the cells are cold, rife with black mold, and the ceiling leaks directly onto the beds.  Inmates are likely to be reluctant to self-report their symptoms knowing that any such admission will result in their transfer to the SHU; this fear of self-reporting only increases the risk of transmission and infection among the population.

As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not actively symptomatic, they will be brought into the MDC and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions.   On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the MDC could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020).

**III.    Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Brito's Sentence and Release Him to Home Confinement.**

The First Step Act ("FSA") expressly permits Mr. Brito to move this Court to reduce his term of imprisonment and seek compassionate release.  *See* 18 U.S.C. § 3583(c)(1)(A)(i).  Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier.  *Id.*  In fact, undersigned counsel transmitted Mr. Brito's request to the warden of MDC via email on March 27, 2020 (see Exhibit C) and again on today's date.  Although the BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Brito files this motion now in light of the urgent nature of this matter.  *See* discussion, *infra* Part III. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020).  "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.*  (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).  However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments.  *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4.  Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

**A. The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.**

The Court need not and should not wait for Mr. Brito to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Brito. *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay

would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not

impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding.   Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Mr. Brito's motion for compassionate release.  *Bowen*, 476 U.S. at 484.  To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ."  18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion.  *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983

12

of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through MDC).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days.  § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)).  With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process.  Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance.  Giving the BOP time to decide administrative applications

for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765.  The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.   And the MDC Legal Department has confirmed to counsel that it has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic.   Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in the prisons.  As one Court held on March 19th:

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested.   And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up.  That's why the Bay Area is on lockdown.  We don't know who's infected.  Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical.  By then it may be too late.

*In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at \*1, 19-MJ-71055 (MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

With the speed and unpredictability of this pandemic in New York City—now the epicenter of the pandemic—waiting even 30 days will be too late.  Accordingly, this Court should exercise jurisdiction over Mr. Brito's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

**B. "Extraordinary and compelling reasons" warrant a reduction in Mr. Brito's sentence.**

*1. COVID-19 is a public health disaster that threatens vulnerable incarcerated persons like Mr. Brito.*

As the numbers have shown, the COVID-19 pandemic continues to roil New York City, and these numbers are projected to double every three days, with the city deemed an "epicenter" of the crisis.[22]  COVID-19 is already sweeping through the city's jails and prisons, too.  As of March 25, 2020, at least 52 inmates and prison employees at Rikers Island and other city jails had tested positive for COVID-19.[23]  Federal facilities are not immune: the BOP has confirmed at least one inmate case and three staff cases

---

[22] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, *available at* https://nyti.ms/2UIkCz4.

[23] Sydney Periera, *Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure to Release People in Custody*, *available at* https://gothamist.com/news/confirmed-coronavirus-cases-rise-nyc-jails-increasing-pressure-release-people-custody.

at MDC Brooklyn and one inmate case at MCC New York.[24]  The numbers are likely
higher, as testing is limited.  *See, e.g.*, *In the Matter of the Extradition of Manrique*,
2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the
infection rate within BOP facilities given that "people are not being tested").  A number
of other inmates are in isolation or quarantine at both MDC Brooklyn and MCC New
York.

Conditions of confinement create an ideal environment for the transmission of
highly contagious diseases like COVID-19.  *See* Affidavit of Dr. Brie Williams, attached at
Aff. ¶ 14 ("Because inmates live in close quarters, there is an extraordinarily high risk of
accelerated transmission of COVID-19 within jails and prisons.  Inmates share small
cells, eat together and use the same bathrooms and sinks.  . . . . They are not given
tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails
and    Prisons.    Clinical    Infectious    Diseases*    45(8):1047-1055,    at
https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he
probability of transmission of potentially pathogenic organisms is increased by
crowding, delays in medical evaluation and treatment, rationed access to soap, water,
and clean laundry, [and] insufficient infection-control expertise").  BOP employees are

---

[24]    Federal    Bureau    of    Prisons,    COVID-19    Coronavirus,    *available    at*
https://www.bop.gov/coronavirus/index.jsp.

complaining that they lack masks and gloves, hand sanitizer, and even soap.[25]  Pretrial detention centers—like MDC—are even more imperiled, as detainees transit through weekly.  *See* Williams Aff. ¶ 13 ("The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently").   Despite the general lockdown in New York State, BOP continues to transport inmates to and from MDC and MCC and has confirmed, on March 25, 2020, that it will not stop admitting new inmates.[26]  This exacerbates the risk of transmission. Though the BOP emphasizes that it screens inmates before moving them,[27] as the *Manrique* Court put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is

---

[25] *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, *CBS News* (March 19, 2020), *available at* https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/;    Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), *available at* https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators*.'" NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[26] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources*, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416%22;

[27]              BOP             Implementing             Modified             Operations, https://www.bop.gov/coronavirus/covid19_status.jsp

just a game of catch up. . . .  We don't know who's infected."  *Manrique*, 2020 WL 1307109, at *1.[28]

The MDC has disclosed to the Chief Judges that as of March 25, 2020, nearly one-third of its current population is high-risk within the CDC's definition (537 inmates), creating a powerful likelihood that the coronavirus will spread throughout the facility, and particularly endanger the at-risk inmates.  In the context of this unprecedented and rapidly evolving emergency, the MDC is simply not equipped to provide adequate medical attention to its detainees, let alone curb the spread of the virus.  It has only three doctors on staff to care for 1700 inmates, 537 of whom are at-risk. *See* Giftos Aff, attached as Exhibit B.  Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the MDC's prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus's impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

---

[28] In fact, according to information the BOP provided to the U.S. Marshals Service, the positive case at MDC Brooklyn came from a new inmate who had left Rikers on March 16, 2020, was brought to MDC Brooklyn that evening, and passed all of MDC Brooklyn's screening tests.  He became symptomatic two days later and was sent to Lutheran Hospital for testing, and returned to the MDC Brooklyn to await the results.  Between March 16, 2020 and when the positive test result was received on March 21, 2020, this inmate had contact with many other inmates and with correctional officers.

**2. Mr. Brito's vulnerability to COVID-19 due to his high medical risk is an extraordinary and compelling reason that warrants a sentence reduction**.

Mr. Brito is particularly vulnerable to COVID-19, as the BOP has already acknowledged by placing Mr. Brito on the list of high-risk inmates.   This is an "extraordinary and compelling reasons" for his release.   *See* Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C).").   Here, Mr. Brito's high susceptibility to COVID-19 falls within the purview of this catchall.   Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like MDC to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Mr. Brito suffers from ailments that have already been identified as "high risk," this Court should find that Mr. Brito legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. Senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible."[29] And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25,

---

[29] https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

2020, New York City announced that it would release 300 inmates from Rikers Island. [30]

Approximately 1,700 inmates have been released from Los Angeles County Jails,[31] and

1,000 inmates are to be released from New Jersey jails.[32]  Therefore, while COVID-19

remains an unprecedented emergency, many states (and politicians) have recognized

that they have a duty to flatten the curve inside incarcerated spaces.  So, too, should

this Court.

**IV.     Mr. Brito Has A Stable Home To Live In, if Released To Home Detention,
Where He Will Be Safer and The Public Will Be Safer.**

If released, Mr. Brito can reside with his wife JOCELYN RIVERA in New Haven, CT

(the specific address is known to the US Probation Office).  I have been informed by

Ms. Rivera that U.S. Probation Officer Desiree Melendez had conducted a residence

check after he had commenced his sentence.  Mr. Brito will receive medical treatment

once released.

---

[30]     https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html

[31]     https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-prevent-coronavirus-outbreak-behind-bars/

[32]     https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html

**V.    Conclusion**

For the foregoing reasons, Mr. Brito respectfully requests that the Court modify

his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement or

hold a hearing as soon as possible.  Should the Court wish to hold a hearing, counsel

waives Mr. Brito's appearance and asks that Client be allowed to appear telephonically.

RESPECTFULLY SUBMITTED,
JONATHAN BRITO

By:    _____

FRANK J. RICCIO II
LAW OFFICES OF FRANK J. RICCIO LLC
923 EAST MAIN STREET
BRIDGEPORT CT 06601-0491
Fed Bar #CT 20980
(203) 333-6135 (phone)
(203) 333-6190 (fax)
frankriccio@ricciolaw.com (email)
www.ricciolaw.com (site)

<u>CERTIFICATION</u>

I hereby certify that on March 31, 2020, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: _____

FRANK J. RICCIO II
LAW OFFICES FRANK J. RICCIO LLC